We'll go back on the record. We will now hear United States v. Dorsey, number 25-2508, and for you interns who are here, this is a criminal law case, it might sound familiar, or at least some of the concepts. So, we'll hear from counsel now. Do you would like to reserve some time? Three minutes, your honor. Great, that's granted. Thank you. Good morning, may it please the court. My name is Andy Shubin, I represent the appellant Alan Dorsey. In Rodriguez, the Supreme Court created a bright-line rule that requires police officers during an ordinary traffic stop to focus on traffic-related missions, which include safety precautions. A police officer, however, cannot prolong a seizure through off-mission detours designed to investigate unrelated potential criminal behavior. So, Mr. Shubin. What is the Rodriguez moment here? Same question. You let everybody else go on for a long time. What's the Rodriguez moment here? So, that's a great question, your honor. The court below doesn't necessarily answer it explicitly. We believe the Rodriguez moment came very early on, about three minutes into the encounter, after the officer had gotten all the information he needed. License registration, he got the insurance information, he knew what he needed to know to run the case, he could write the citation very quickly. I've watched the video a few times, but I don't remember exactly what happens at which minute. So, remind me, are you saying this is after Mr. Blake comes to Officer Cook's car? Yes, this is after Mr. Blake comes to the car, but not long after. In fact, the district court, I believe, recognized the Rodriguez moment in its opinion, appendix page 34, where it says, Dorsey's failure to provide his last name provided limited but sufficient grounds to extend the stop before Cook separated the two and began an unrelated line of questioning. So, I just want to make sure I'm following you here. The first time that the officer asked the first name, last name, sorry, both Mr. Blake and Mr. Dorsey are sitting in the car? That's correct. Is that the moment for you? No. Okay, all right. That's not the moment. All right, so then they're separated. The officer brings Mr. Blake back to the car and begins to ask questions. At some point during that, he says something like, what's going on with your friend? Is that the moment? Yeah, what's up with this dude? Yes. Is that the moment for you? That is basically the moment, but it's not solely the moment. So, he brings Blake back to the car and we don't have a problem with that. He's running the information and we don't have a problem with the beginning of that. The beginning of that, he's running information to confirm that he's a licensed driver, which he does. So, he confirms that. But improper about that, right? There's nothing improper about that. He knew who the driver was before he even pulled the car over, right? Yes, he did. In fact, he had run the registration before he made the traffic stop. So, he knew who the driver was. The driver identified himself initially at the stop. The driver's name matched the registration information that he had. And then he later confirmed all the information he needed to confirm it very early on. In fact, the officer makes that essential. I know this is an objective standard, but the officer makes the admission very early on that he had gotten everything he needed and he wasn't going to hand over a citation at that point because he wanted to continue with the criminal investigation. It's extraordinary admission, but even though we have an objective standard here, it is what the court found because the court found at that moment, that's when he began engaging in unrelated questioning. So, just to go back to the video. So, the officer starts to ask things like, are you on probation? Yes, for what Mr. Blake tells him. You have this, they talk about the fishing without a license incident. Is all of that on mission still? No, that's off mission. It's way off mission. So, he confirms everything he needs to confirm. He's got a record in front of him, a criminal record in front of him. Now, in Hunter, of course, there are times when it's okay to look at a criminal history. If it's a brief sojourn to look at it, you're not being necessarily detained for a long period of time. But he pulls up the criminal history, but it's not only the criminal history. He pulls up records that indicate that he had a PFA. He pulls up records that indicate what his criminal history was. Is that really material? Because wasn't he asking questions while this was being run? It wasn't simultaneous? So, Judge, we run into a diligence problem at that point. Part of it was simultaneous. The part where he says, where he confirms looking at the record that he's a licensed driver, that's simultaneous. And maybe looking at the criminal history, if it was warranted in this case, is okay. But he goes beyond that. He goes beyond that. He asks, he pulls up records, and I asked the officer this. I said, you mean to say if you pull me over, you're going to be looking at records of when I contacted the police to complain about my neighbor dropping trash on my lawn 10 years ago? Yes, I was looking at all of those records. And then he veers off into discussions about what he knows about the passenger. And he starts discussing an ex-girlfriend that he somehow found on a record. And then he goes off into saying, hey, do you mind, or do you have any drugs in the car? It wasn't enough for him to say no. Do you have marijuana? Do you have meth? Do you have coke? Do you have, you know, every single drug in the book. He goes one by one. And then he, and questions him again about his criminal history, which he already knew about. So there's no justification at that point. He already knew what his criminal history was, but he's questioning him to test his credibility, to build suspicion that he does not have. So what was the mission here? The mission was to write a traffic citation, period, at the end. This guy was driving. He touched the yellow lane three times. It was a pretextual stop. Two African Americans, 10 p.m. in Center County. So that's, of course, pretextual stops are not illegal. And we did initially challenge the tires touching the yellow line, but that was it. There was no – That's not part of this appeal, right? I'm sorry, I didn't hear you. That's not part of this appeal, right? That's not part of this appeal. It is not part of this appeal. But the passenger, I mean, excuse me, the driver, when he's coming back to speak with the officer, he recognizes at some point that this is nothing to do with the traffic stop. And he says, hey, I know what this is about. I mean, the officer gets defensive. I know that this is all negativity. I mean, he's essentially referring to the fact, I'm a black guy, you're stopping me because, you know, for a pretextual stop. And you are elongating it. You're trying to get this information out of me about my passenger for a pretextual reason. So at eight minutes and 20 seconds, the officer says something's up with this – at eight minutes and 20 seconds, Cook says something's up with this guy. Yeah. What's going on there? It's off mission. It's a fishing expedition. Mission's over. Mission's over. That's right. That's right. And what Judge Brand, I think, hung his hat on was the fact that very early on, within the first few minutes, while Blake is searching for his documents, the officer turns to Mr. Dorsey. And this is fine because this is in the flow of what's necessary. What's your name? And he says, Albert. And the cop says, Albert what? And he said, what, did I do something wrong? And the cop says, no, just making conversation. That happens at three minutes. That happens within three minutes. That happens in three minutes. So is that part of the mission? Of course not. It's not a part of the mission. And it does not provide reasonable suspicion to turn this into a 22-minute detention, which includes searching all parts of the car. So in fact, those questions that he asked Mr. Dorsey and Mr. Dorsey's response, those are really important issues, questions. Like as a passenger or as a pedestrian, we should be able, we should feel free to be able to ask a police officer when they're asking for our information, what, did I do something wrong? And he also said, I live across the street. Do you mind if I leave? So he said two things that Judge Brand thought perhaps that they were a justification to elongate the stop. Number one, Albert who? What do you need, you know, what, did I do something wrong? And may I leave? What about, do these things matter? The inconsistent statements about which gas station, the inconsistent direction of travel. So, you know, there was, I'm coming from sheets or I can't remember which of the other ones. Sheets or snappies. That's right. Sheets or snappies. And then the officer also says it was inconsistent for him to be coming from either of those given where I, given where I observed, how I observed the direction of traffic. The officer said that Blake was nervous and rigid and that you had the multiple requests to leave. The officer said that Blake's offers to do a sobriety test in his, in his expert opinion, in his, in his, you know what, you know what I'm trying to say, but that it is evidence of someone trying to direct the officer's attention from what he's doing. All of those things, reasonable, sufficient, sufficient to. Well, even, even if they were, they happened much later after the Rodriguez moment came without reasonable suspicion. So they're not acceptable. You can't inform reasonable suspicion by something that happens after the Rodriguez moment. But I mean, I could go through them one by one, but I don't really don't believe that. I don't think the record's very clear about what the supposed confusion was in terms of describing where he was coming from. You know, in Philly, I call every sheets Wawa, even though it's so, I mean, it's not, not a huge deal. That's why I couldn't think of it. I'm like, what is it? It's not Wawa. So, but again, I want to get back to the, what I think is important, the nature of what the Judge Brand seized on, which is what did I do wrong? And am I free to leave? These are sort of talismanic questions that we, that we ask, right? When we're, I mean, my son is about to start college. I told him, if you have, God forbid, an encounter with the police, ask the police officer, what did I do? Am I free to leave? And if we're going to call that reasonable suspicion, that's really problematic. And that's what happened in this case. Okay. If you don't have anything else, we'll, we'll hear from your adversary. Thank you,  Morning, Your Honors. May it please the court, counsel. Christian Hogsby on behalf of the United States. In 2024, this court said that an officer who approaches a suspicious vehicle has no way of knowing who or what he will find behind the wheel and necessarily exposes himself to a danger of attack. That was in the United States versus Jackson. There were differences between the stop in Jackson and the stop in Mr. Dorsey's case. But the court in 2024 hearkened back to a through line in these kinds of traffic stop cases. And that is that they are inherently dangerous. The courts have frequently focused on the danger to officers during stops. And your colleague, Judge McKee, highlighted some of the dangers that passengers or maybe occupants of vehicles or drivers may also face. And he said that in the Hunter concurring opinion. But you note that that's a consistent through line. So in Pennsylvania versus Mims, the court identified the thousands of assaults that occur every year. That was in 1977. In 1983 in Michigan versus Long, the court highlighted the danger to officers in traffic stops. What's the Rodriguez moment in your opinion? Uh, I don't know that we're that far off here, Your Honor. Um, we, like Mr Shubin, do not agree that the Rodriguez moment was as early as is, I think, a little bit suggested in the case upon Mr Dorsey's, um, refusal to provide his last name. Um, I believe it occurred at Trooper Cook's vehicle during the conversation with Mr Blake. Um, when he began ticking through his questions regarding Do you have guns in the car? Meth in the car? Coke before he asked to search the car? Correct, Your Honor. Correct, Your Honor. And, um, and just to just sort of finish up what I was talking about initially regarding the danger. There have been a lot of back here. What was the mission? I mean, was it to search the car? What was the issue? The citation? I think initially, Your Honor, to issue a citation. Um, but staying on the question you're asking, the purpose of that stop changed over time. Um, the particularly when reasonable suspicion was developed and that occurred within minutes of that traffic stop, you know, it's command. The officer says on the on the on the video at 13 19. I come up, I come up to talk to you and I see indicators of criminal activity. What indicators of criminal activity were available to the police officer when he first approached the car? Well, number one, Your Honor, I will. There is a constant that's not resolved in this case until the end. Mr. The trooper cook observed both Mr Dorsey and Mr Blake unseat belted in the vehicle. Yes, that's the criminal activity we're talking about. Well, Your Honor, it is criminal activity that comes up throughout the encounter, particularly at the end when that point is made clear. And in appendix 1 62 Mr Dorsey is in fact cited for that particular violation as well as the violation of not providing his identity. Let me ask you about that. The officer tells Mr Dorsey about the seat belt at the end of the stop, very close to the end of stop after the search. By that point, by my count, Mr Dorsey had asked about 22 times why he was being detained and if he had done something wrong and the officer never tells him anything about the seat belt. Does that matter at all? And if not, why not? We would say no. Your Honor, I think that what happens very early on in this encounter is is the is the what what trooper cook testified was that evening a unique experience and an unusual one in his experience as a trooper that he had a passenger who refused to identify himself at that point. I think the trooper cook the record, the video indicate that he took steps at that point to separate driver and passenger which appeared appears from the video I think and objectively to have been a reasonable step to have taken to diffuse what could have become a tense situation. Passengers have an obligation to identify themselves? So that's an interesting question Judge Restrepo. We believe that the the overwhelming majority of case law would suggest that the answer to that question is yes. We pointed out a couple of those decisions, both on either side. I think that the Ninth Circuit in Landeros indicated that ordinarily a passenger's identification is not part of the core mission of the stop. But that opinion I think is outweighed by decisions out of the Seventh Circuit in Muriel and the Fourth Circuit in Soriano-Jarquin in 2007, the Eighth Circuit in Rodriguez-Hernandez in 2003, the Rice and Cortez opinions out of the Tenth Circuit in both 2007 and notably in 2020 after Rodriguez, and the First Circuit in Fernandez from 2010. I also note that in the Eleventh Circuit there was a decision in a case called Johnson v. NACO from 2024. That's N-O-C-C-O. That was a civil case where the court was looking at whether or not it was clearly established that officers could or could not ask for passenger identification. And the majority in that case found that that was not clearly established. So do those cases deal with a situation potentially as here where, maybe I should just ask, do any cases suggest that a reasonable suspicion of criminal activity can be based solely on a person not identifying themselves? I'm not aware of a case to point your honor to saying that just that single objective factor would support that finding. We think in certain cases it might. But in this case and in response to Judge Montgomery Reeve's question, there were, we believe, at least five factors that would have objectively supported further investigation. And those would include, of course, the failure of Mr. Dudley to identify. I'm sorry, Mr. Dudley. I've already been misled. Mr. Dorsey, his failure to identify himself. But then particularly very early on when Mr. Blake is asked, hey, what's up with that guy? And he says, hey, that's my people. And then he he says, OK, well, what's his last name? And he says, it's a buddy. I call now. That was eight minutes into the stop. OK. Yeah. And not that far into it, your honor. And while and I would point out that you can tell eight minutes is a lot longer than it would have taken to issue a traffic citation. I'm not sure, your honor, if it was. Well, actually, he knew that who the car was registered to before he even pulled the car over. And the record's clear on that. Well, he at least knew what came back on his computer. And that jived with what Mr. Blake told him at the door side of the Honda. Now, that that did not end things in terms of issuing the citation or the overall scope of the search. And I think that that's consistent with this court's opinions and Green and Garner and Hunter and Ross, that there are still other activities that need to be undertaken to complete that mission and to complete it safely. So, for example, this court has been consistent again. You say the search is part of the mission. No, your honor. I didn't mean it was the mission. The mission originally is to issue a traffic citation. When does the officer have what he needs to complete that mission? Well, I don't think the officer had that until he had completed the running of the records in his vehicle. I think the court's been consistent that running those records and checking to see whether there are outstanding warrants and checking criminal history and matters such as that are part of the court permissible mission of a stop to ensure that it's undertaken safely. So it's not the case that in every one of these traffic stops you can say, okay, the information you've provided me jives with what came back to me on the computer and I can't look at anything else. It's an ordinary part of a traffic stop to check for warrants, to check criminal history and the like. And is it also an ordinary part of a traffic stop to then talk about how I'm going to get a have the dog here? Your honor, at that point, things have changed. Okay, what changed? Well, he was investigating further activity. So the reasonable suspicion on reasonable suspicion what you're asking, what was it at that point in terms? Okay, thank you, your honor. I'm gonna go back to that so that the initial the initial, uh, factor that we would point the court to, of course, is the failure of both Mr Dorsey and Mr Blake to identify the passenger. The sketchy travel plans. I think what Mr Judge Brand described as inconsistent that is something that you'll see in Green and Garner is a factor that this court has considered. The diversionary tactics that the trooper sort of perceived from Mr Blake regarding his insistence that he'll take a sobriety test or sort of, you know, steer the investigation in that direction. There was testimony at the outset of the stop that Mr Blake did appear to be nervous and rigid. Even if we go with you on that and there's ask him about drugs and says, can I search your car and gets permission to search the car? The officer searched the car and finds nothing. Why at the very latest shouldn't everything have ended at that point? Well, I would refer back to the fact that there was another violation that was observed. I'm glad you brought us back to that. So in Rodriguez and Rodriguez says that an officer has to be reasonably diligent and a traffic stop can be prolonged. Traffic stop prolonged beyond that point is unlawful. How is it reasonably diligent for the officer to have waited that long to identify this additional reason for traffic stop? Let me state that a little differently. Can an officer stagger the reasons for a traffic stop to extend the time? Well, I think your honor, they could in some situations and I think this may be one of them where you had a very unusual aspect of this encounter from the jump. And just so I know the very unusual here, that one factor that makes it very unusual is a refusal to provide the last name. Yes, your honor. Okay. Yeah. So again, we're not hanging this entire case on that and that incident or that instant in this traffic stop, which, you know, really for all intents and purposes lasted 28 minutes. And I would submit to you that much of the delay, uh, that's a, if you can call it delay in that 28 minute period is attributable solely to Mr. Dorsey. Um, he interrupts the traffic stop repeatedly. He argues with the officer repeatedly. He delays the actual search of the vehicle that the officer has gotten consent to undertake. He's quarreled with the officer about who has consistently honored everything that Mr. Dorsey has asked of him, except for the fact that he'd like to leave the traffic stop. Mr. Dorsey. Right. So Dorsey's in the car most of the time. He is in the car most of the time, but your honor, if you watch the video, you can see him interrupting the interaction between trooper cook and Mr. Blake by sticking his head out the window and shouting back questions. And then when trooper gets out of the car, um, Mr. Dorsey continues to interrupt his conversation with Mr. Blake, which is continuing to be undertaken at the side of the police officer's vehicle. So there are numerous instances on that video where Dorsey is interrupting this process and it's unmistakable, your honor, when trooper cook goes with Mr. Blake's permission to go search that car and Dorsey won't get out of the car initially. And then when Dorsey does get out of the car, he refuses a pat down. For example, he refuses to allow, he insists that none of the objects that he's taken out of the car are going to be subject to his rights. He's well within his rights to refuse a pat down. And it's well within his rights to say, no, you can't search my stuff. Right. Well, we might be able to debate whether he's within his rights to refuse to submit the pat down. And it might be with debatable whether he can remove any article that he chooses from a vehicle that he's a passenger. And I think that the law is not entirely clear, your honor, that Mr. Blake gets to call the shot. Mr. Dorsey gets to call the shots on what is in that car belongs to him. I think that that is probably something that Mr. Blake could have done and said, Hey, the consent that I've, uh, I've given you to search that vehicle does not extend to Mr. Dorsey's bags. But instead what you have in this case is Mr. Dorsey getting out of the car, arguing with an officer and then pulling three bags and a Bluetooth speaker out that's audibly playing and arguing with the officer. I think there's no way to watch that video and say that there's any, the locus of that delay is anywhere other than Mr. Dorsey. So when your honor says that it's within his rights to do all of those things, I think I'd have to push back a little bit on that because he's about to undertake a consent search of a vehicle. And I will also say this, that Mr. Dorsey is lecturing the trooper over and over and over again about what his rights are and he's getting it wrong most of the time. He says, I don't have to get out of the car. Well, he certainly does. Maryland versus Wilson says that the officer can order him out of the car as a matter of course, it's a bright line rule. Um, and if the officer objectively had reasons to fear for his own safety or the safety of the situation, he could have subjected them to a pat down at that point. I don't think that the person that is suspected of wrongdoing in that moment, which at this point is Dorsey, um, has the prerogative to dictate how the search of the vehicle is going to go or whether or not the officer is going to conduct a safety pat down. And he didn't conduct, he did not conduct a safety pat down. He didn't. And your honor, I don't think that that, you know, I think that this gets back to the objective nature of this inquiry. Could it have been done? Yes. Did he do it? No. But what, what I think you're seeing in that video is a, is a trooper who I, I, I really, you know, the advantage of having this video is that we don't have to rely upon a description of counsel. You know, when you go back to these early car stop cases, I'm not sure anyone could even envision a day when you had a high definition, um, onboard camera with a pretty good microphone that captures pretty much everything and every angle of that stop. So there's something about this. Yes, we rely on the articulable suspicion, but we can also watch and listen to what is happening and see how it's happening in real time. And that, and that, and that is, I think an important factor here in this record. Um, so, uh, in offering that explanation, your honor, I may have lost a question if you were posing one and I want to make sure I address it. Um, I'm staring at you. I'm getting nothing. So, okay, fair enough. Um, I'm, my time is running low. Um, we don't, we don't know that you necessarily need to answer the question about whether or not the officer can demand, um, the passenger's identification. We believe the court could and should do that. It appears that the majority of circuits have reached that conclusion in the context of a traffic stop like this. Um, but at a minimum, Mr. Dorsey's refusal and Mr. Blake's refusal to identify the passenger when taken in combination with the other factors that our viso tells us that the court must do in balancing, um, these fluid situations and whether or not there is reasonable suspicion to further that investigation. But that is a factor, uh, that supports a finding of reasonable suspicion and a deviation from the mission of that traffic stop to conduct further investigation. Just so I'm clear with respect to if we, if, if we agreed with you that there was reasonable suspicion to extend the stop to allow the questions about, uh, drugs in the car and gets us through the consent to search and a search such that the search happens, the officer walks back up to Mr. Dorsey and he's like, all right, I'm tired of playing with you. Give me your last name. At that point, the only reasonable suspicion that we have, we have the seatbelt violation, right? We have the seatbelt violation, yes. Is there anything else? Well, let me, let me try to answer your question. If I'm getting it wrong, I hope you'll correct me. So in terms of the, the, the search of the vehicle, we would submit that that was part of the safety mission of this stop as well as conducting additional investigation. Searching a vehicle as part of the safety mission? I think it can be, Your Honor. Yes. Um, I think that, uh, and I think that, I think that what we, well, that would allow them to search every car if they stop. No, Your Honor. I, I'm not suggesting that. I'm suggesting that the, the concern about criminal activity being afoot is, um, certainly was informing the actions of Trooper Cook that followed his encounter with Mr. Blake at the side of the vehicle. So when Judge Montgomery Reeves is asking, well, what's left after that search is conducted and no contraband or weapons are found? I mean, you still have the issue regarding the initial observation regarding the seatbelt. And I, and I, I'm sensing a little bit of skepticism from the court on that. And I understand. And I'm trying to figure out if there's anything. If I, if I say, you know what, Rodriguez tells us you, you have the time that it would take a reasonable officer. No way. This is reasonable. What else do you have? Well, you have that you have that violation, Your Honor. And the law, I think it's clear that where you had that violation, the officer was within his rights to demand at that point that Mr. Dorsey provide his identification at that point. And the fact that the officer didn't escalate the situation prior to that moment, I don't think, um, you know, somehow erases the fact that there was that violation that still needed to be addressed. So when Mr. Dorsey then is confronted and asked for his identification, he asks, in fact, what am I under investigation for? The officer says for a seatbelt violation. Um, you know, I would, I would point out that, you know, under Pennsylvania law and section 4914 of title 18 of the Pennsylvania statutes, you know, the failure to provide identification when you are told that you are under investigation for a specific violation is an, is itself a violation of law. And that offense was also charged against Mr. Dorsey that night. Um, so I would make that point as well, Your Honor, as well as the seatbelt violation. I want to make sure I address any lingering questions Your Honor has. You've addressed my question very well. We would ask that the district court's judgment, Judge Restrepo, did you have one? I'm sorry. No, just checking. We would ask that the district court's judgment be affirmed. And thank you, Your Honors. Thank you, Counsel. And we'll hear rebuttal. Your Honors, I want to tease out the timeline a little bit. In the first couple of minutes, there's, it's not quite accurate to say that Mr. Dorsey refused to identify himself. In the first couple of minutes, what happened was the officer said, what's your name? He said, Albert. Albert, what, what, did I do something wrong? That's not, to me, that's not, that's not a refusal. That's, if you want something, can you give me some clarification why you're asking? And no, there is no bright line rule that they can demand, demand identification from a passenger in a traffic stop in this circuit. Brown v. Texas in 1979 Supreme Court case says that without reasonable suspicion, you can't demand that a citizen provide identification. So he did not have reasonable suspicion at that point. Is the seatbelt enough? The seat, the seatbelt, the seatbelt, as a matter of Pennsylvania law, the seatbelt charge, and this is explained in my brief, footnote 29, can't be charged or can't be orphaned from an underlying charge. In other words, if you're going to cite someone with a seatbelt violation, you have to show that there was an underlying violation, which is not possible when you're talking about the passenger. But beyond that, Judge Brand never made any findings based upon whether the, the, the officer's testimony was credible regarding the seatbelt violation, whether it actually occurred or whether that's the reason why he asked, he asked Dorsey for his identification. In fact, what the, what the MVR suggests strongly is, is that even though Dorsey is practicing street law, he is not, I'm not, I'm the passenger. And he said, and then, then, then the trooper says, well, what if I write you a seatbelt infraction? That's like 24 minutes into or 22 minutes into the, into the stop when he first suggests the seatbelt violation. And not for nothing during the suppression hearing, the officer conceded that he had no evidence that the, that the passenger or the driver were not seatbelted while the vehicle was moving. The only seatbelt evidence he had was ascertained after the stop when they had already pulled over. He just had no information regarding the seatbelt information. So we think that there's nothing in the records to suggest the seatbelt had anything to do with it other than the trooper throwing out a last minute Hal Mary. Your friend was talking about how your client repeatedly interrupted questioning. How do you respond to that? Well, the repeated interruptions are, are essentially saying, you know, why am I here? I live across the street. Does that give reasonable suspicion that perhaps a crime is afoot or that there's a safety concern? Categorically, I can't say no, but we have a, we have a Hurt problem here, a U.S. versus Hurt problem where you have exigencies that were created by the police's, by the, by, by, by the police choice of how to order things and the police choice and how to practice things in Hurt. If you recall, it's a Philly traffic stop and with a DUI stop, they pull the driver out. The, the, the officers notice strong smell of alcohol in the car. They notice a passenger who's very drunk and who's very valuable. And they start the field sobriety tests. And at some point they put the, the, the driver into the back of the police car and the officer goes into the car. And at that point he sees people acting furtively. He gains all sorts of, of suspicion at that point. But again, that was a diligence issue that Rodriguez forbids. The officer had stopped the mission in order to investigate an independent crime. And that was not okay. And this court's granted the motion to suppress and this court affirmed it. Okay. Thank you. Thank you, counsel. We thank counsel for their excellent briefing and oral argument today. We'll take the case under advisement. We'll take a short recess. We'd like to meet counsel.